D.W. NELSON, Senior Circuit Judge,
dissenting:
I agree with the majority that the Bureau of Safety and Environmental Enforcement (the Bureau) did not act in an arbitrary or capricious manner in approving the oil response plans, and I concur in the majority opinion as to that issue. I respectfully dissent, however, from the remainder of the majority opinion.
In my view, the Bureau was required to engage in consultation pursuant to the Endangered Species Act (ESA) before approving Shell’s oil response plans. Moreover, the Bureau should have conducted *1227 analysis pursuant to the National Environmental Policy Act (NEPA) before approving the oil response plans. Thus, I would reverse the grant of summary judgment as to ESA consultation and compliance with NEPA.
1. ESA Consultation
The majority holds that the Bureau’s approval of an oil response plan is a non-diseretionary action, and, thus, the Bureau had no obligation to consult pursuant to the ESA. I disagree.
a. Agency Action
The first question is whether the Bureau engaged in agency action. It did. The duty to consult exists only where “agency action” is present. Natural Res. Def. Council v. Houston, 146 F.3d 1118, 1125 (9th Cir.1998). Agency action includes “federal agencies’ authorization of private activities,” such as the Bureau’s approval of the oil response plans here. Karuk Tribe of Cal. v. U.S. Forest Serv., 681 F.3d 1006, 1021 (9th Cir.2012); 33 U.S.C. § 1321(j)(5)(F).
Of course, not all agency actions necessitate consultation. Indeed, only those actions that “may affect” a protected species trigger the requirement, 50 C.F.R. § 402.14(a), though the “may affect” requirement is an admittedly low threshold, Karuk Tribe, 681 F.3d at 1027. Here, the approval of the oil response plans satisfies the “may affect” standard. In the event of an oil spill, Shell would have to carry out its oil response plan, which governs the protection of wildlife. 30 C.F.R. § 254.5(a). Thus, the Bureau’s decision to approve the oil response plans, or to require amendments to those plans, “may affect” a protected species.
b. Agency Discretion
Next, we must consider whether the Bureau had discretion to approve the oil response plans. It did. “The ESA’s consultation duty is triggered ... only when the agency has authority to take action and discretion to decide what action to take. There is no point in consulting if the agency has no choices.” Ctr. for Food Safety v. Vilsack, 718 F.3d 829, 842 (9th Cir.2013). What is more, “the discretionary control retained by the federal agency also must have the capacity to inure to the benefit of a protected species.” Karuk Tribe, 681 F.3d at 1024.
“Whether an agency must consult does not turn oh the degree of discretion that the agency exercises regarding the action in question, but on whether the agency has any discretion to act in a manner beneficial to a protected species or its habitat.” Natural Res. Defense Council v. Jewell, 749 F.3d 776, 784 (9th Cir.2014) (en banc). In other words, if the agency could take action that benefits protected species, the agency must conduct ESA consultation. , See id.; see also Karuk Tribe, 681 F.3d at 1024 (“[T]o avoid the consultation obligation, an agency’s competing statutory mandate must require that it perform specific nondiscretionary acts rather than achieve broad goals.”). Ultimately, “[t]he relevant question is whether the agency could influence a private activity to benefit a listed species, not whether it must do so.” Karuk Tribe, 681 F.3d at 1025.
In my view, the Bureau’s decision to approve or reject an oil spill response plan is precisely the kind of discretionary act that triggers ESA consultation. The Oil Pollution Act requires private owners or operators of vessels and facilities, such as Shell, to prepare an oil spill response plan. 33 U.S.C. § 1321(j). This response plan must explain how an operator like Shell will respond “to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance.” 33 U.S.C. *1228 § 1321(j)(5)(A)(i). The phrase “maximum extent practicable” suggests that Congress intended entities like Shell to create plans that have the capacity to respond to an oil spill to the greatest possible degree, given logistical constraints. See 30 C.F.R. § 254.6 (defining “maximum extent practicable” as “within the limitations of available technology, as well as the physical limitations of personnel”). At the same time, this broad, subjective standard does not direct the Bureau to act in a specific or clearly defined way, but, rather, contemplates that the Bureau will exercise its judgment when determining whether an oil response plan satisfies the “maximum extent practicable” requirement. See Karuk Tribe, 681 F.3d at 1024-25.
The implementing regulations bolster my view, as they make clear that the Bureau can exercise its discretion to benefit a protected species. For instance, the regulations require both an owner or operator to identify resources of “environmental importance” that could be harmed by a “worst case discharge scenario” and to provide strategies that will be used to protect those resources. 30 C.F.R. §§ 254.26(a), (c). In addition, the regulations also call for an owner or operator to explain how, in the event of an oil spill, it will “protect beaches, waterfowl, other marine and shoreline resources, and areas of special ... environmental importance.” 30 C.F.R. § 254.23(g)(4). Furthermore, Shell’s response plans themselves underscore the importance of protecting wildlife. Each plan devotes an entire appendix to discussing wildlife protection tactics and includes measures to protect wildlife.
Shell and the government would have us hold that the Bureau lacked discretion here because the Oil Pollution Act states that the Bureau “shall approve” any oil response plan that meets the statutory criteria. 33 U.S.C. § 1321. This compulsory language, the argument goes, reflects the absence of Bureau discretion. I disagree. The Bureau cannot avoid consultation here because it is not obligated to “perform specific nondiscretionary acts.” Karuk Tribe, 681 F.3d at 1024. Neither the Oil Pollution Act nor its implementing regulations sets forth a rigid, mechanical set of requirements that specify when the Bureau must approve an oil response plan. There is no checklist to be ticked off; approval is not rote. Rather, the Bureau must consider a wide range of environmental, ecological and other factors in deciding whether an oil response plan meets the “maximum extent practicable” standard.
Shell and the government note that the Bureau interprets the implementing regulations as coextensive with the “maximum extent practicable” standard. Thus, they contend, and the majority agrees, both that the regulations do not give the Bureau any discretion and that we should accord Chevron deference to the Bureau’s interpretation of the Oil Pollution Act. Yet again, I disagree.
Our analysis pursuant to Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), involves two questions. First, we ask “whether Congress has directly spoken to the precise question at issue.” Id. at 842, 104 S.Ct. 2778. If so, the court “must give effect to the unambiguously expressed intent of Congress.” Id. at 842-43, 104 S.Ct. 2778. But “if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.” Id.
Here, I do not believe the implementing regulations contain a reasonable definition of “maximum extent practicable.” The regulations reference the phrase only once. They provide: “Maximum extent practicable means within the limitations of avail *1229 able technology, as well as the physical limitations of personnel, when responding to a worst case discharge in adverse weather conditions.” 30 C.F.R. § 254.6. If this occupies the full and complete definition of “maximum extent practicable,” it is unreasonable and not entitled to deference. The word “maximum,” a superlative, means “the highest possible magnitude or quantity of something,” or “highest, greatest.” Maximum, Oxford English Dictionary, http://www/oed.com/view/Entry/115275?redirectedFrom=maximum# eid (last visited April 27, 2015). Thus, the phrase “maximum extent practicable” also has a superlative quality and therefore must refer to the greatest option in a range of possibilities. But the Bureau’s definition is not a superlative, as it refers to a range of possibilities, taking into account practical limits. Thus, it gives effect only to the term “practicable” while ignoring the term “maximum.” We should not defer to this nonsensical and incomplete definition. Coronado-Durazo v. I.N.S., 123 F.3d 1322, 1324 (9th Cir.1997) (“We are not obligated to accept an interpretation that is demonstrably irrational or clearly contrary to the plain and sensible meaning of the statute.” (internal quotation marks and citation omitted)). The regulations merely clarify that owners and operators, such as Shell, will not be held to an impossibly high standard that exceeds current technological capabilities and other logistical constraints.
The majority relies on the Natl Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007), to hold that the Bureau has no discretion to determine whether Shell complied with the six statutory factors enumerated in the Oil Pollution Act. I find this argument unpersuasive. In Home Builders, the Supreme Court noted that the Clean Water Act required the Environmental Protection Agency to approve an application to transfer permitting authority to a state, unless that state lacked the authority to perform the nine functions spelled out in the statute. Id. at 661, 127 S.Ct. 2518. The Court described the statutory language as “mandatory” and the list of nine functions as “exclusive,” holding that “if the nine specified criteria are satisfied, the EPA does not have the discretion to deny a transfer application.” Id. At the same time, however, the ESA required consultation, in addition to the nine enumerated factors. Id. at 662, 127 S.Ct. 2518. Faced with these irreconcilable statutory directives, the Court held that the later-enacted ESA did not amend the Clean Water Act in part because requiring ESA consultation would “engraft[ ] a tenth criterion onto the [Clean Water Act].” Id. at 663, 127 S.Ct. 2518.
This case, however, differs in significant respects from Home Builders. First, the Supreme Court’s analysis in Home Builders hinged in part on the fact that the ESA came after the Clean Water Act. See id. at 662-64, 127 S.Ct. 2518. Here, however, the Oil Pollution Act of 1990 postdated the ESA. 33 U.S.C. § 2701 et seq. (Oil Pollution Act); 16 U.S.C. § 1531 et seq. (ESA, passed in 1972). In fact, Congress passed the Oil Pollution Act after ESA consultation already had been required for seventeen years. Thus, the concern that ESA consultation implicitly amended an exclusive set of statutory requirements of the Oil Pollution Act by adding a new requirement beyond the original enactment is absent here. Moreover, both parties in Home Builders appeared to agree that the state possessed the authority to perform each of the nine enumerated functions but disagreed about whether ESA consultation added an extra step to the process. See 551 U.S. at 662, 127 S.Ct. 2518. The question here is of a different sort. It is not whether the “maximum extent practicable” standard adds an additional step to the approval process for oil spill response plans but about how to interpret “maxi *1230 mum extent practicable,” which is one of many subjective items the Bureau must consider in whether to.approve an oil spill response plan.
2. NEPA Consultation
The majority holds that because the Bureau had no choice but to approve any oil response plan that met the enumerated requirements in the Oil Pollution Act, the Bureau was exempt from NEPA review. I disagree.
NEPA “declare[s] a national commitment to protecting and promoting environmental quality.” Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934, 945 (9th Cir.2005). NEPA achieves these broad goals by “merely prohibiting] uninformed— rather than unwise — agency action.” Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Specifically, NEPA requires agencies to prepare a detailed environmental impact statement (EIS) for “major Federal actions significantly affecting the quality of the human environment.” 42 U.S.C. § 4332(2)(C). An EIS “must inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.” League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv., 689 F.3d 1060, 1068-69 (9th Cir.2012) (internal quotation marks and citation omitted).
Here, the Bureau did not conduct any NEPA analysis, which the majority forgives, reasoning that approval of the oil response plan fell within the “rule of reason.” Dep’t of Transp. v. Pub. Citizen, 541 U.S. 752, 769, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004). In other words, where an agency is obligated to take specific action, an analysis of the environmental impact of that action serves no purpose. Id. But this’ exception does not apply where an agency has “statutory authority to regulate the environmental consequences” of a major federal action. League. of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv., 549 F.3d 1211, 1217 (9th Cir.2008). That is the circumstance here.
The Bureau did in fact possess the kind of discretion that necessitated NEPA review. The Oil Pollution Act and its implementing regulations grant the Bureau significant authority to regulate the activities of owners and operators of offshore facilities. The regulations demand that the plan include provisions for protecting wildlife and areas of special environmental importance. 30 C.F.R. §§ 254.23(g)(3)-(4), (7). In addition,- the Bureau must apply the broad and amorphous “maximum extent practicable” standard in considering the validity of an oil response plan. 33 U.S.C. §§ 1321 (j)(5)(A)(i) & (D)(iii). This subjective process gives the Bureau the authority to require amendments to the plan. Id. at § 1321(j)(5)(E)(ii). Thus, I would hold that because the Bureau regulates the response activities and prevention efforts of entities like Shell, and because it retains authority to ensure that those entities’ response efforts will protect the environment effectively in the event of an oil spoil, it is not exempt from its duty to conduct NEPA review.
Morever, the Oil Pollution Act specifically directs the Bureau to consider environmental factors in its decisionmaking process. Thus, requiring NEPA analysis is squarely in line with “NEPA’s core focus on improving agency decisionmaking.” Pub. Citizen, 541 U.S. at 769 n. 2, 124 S.Ct. 2204; 40 C.F.R. § 1500.1(c). Because environmental protection lies at the core of the Bureau’s duties pursuant to the Oil Pollution Act, NEPA review would not offend the rule of reason.
I also do not think that the Bureau discharged its duty to conduct NEPA re *1231 view by relying on previous analyses that considered the environmental impact of oil and natural gas exploration in the Arctic. Certainly, an agency may rely on prior analysis to discharge its duties pursuant to NEPA. See Pub. Citizen, 541 U.S. at 767, 124 S.Ct. 2204; 40 C.F.R. § 1500.1(c) (“NEPA’s purpose is not to generate paperwork — even excellent paperwork — but to foster excellent action.”); 43 C.F.R. § 46.120(b) (“If existing NEPA analyses include data and assumptions appropriate for the analysis at hand, the [agency] should use these existing NEPA analyses and/or their underlying data and assumptions where feasible.”).
But an agency cannot discharge its duties pursuant to NEPA solely by relying on prior analyses if those analyses do not fulfill NEPA’s purpose of ensuring “that the agency has taken a hard look at the environmental effects of the proposed action.” Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir.2003) (internal quotation marks and citation omitted). Here, the documents on which the Bureau relied did not discuss alternatives to approving Shell’s response plans. N. Idaho Cmty. Action Newtork v. U.S. Dep’t of Transp., 545 F.3d 1147, 1153 (9th Cir.2008) (noting an EIS requires “rigorous” evaluation of alternatives); 43 C.F.R. § 46.120(c). The prior analyses do provide some consideration of oil spill response techniques, but they have nothing to say about alternatives to Shell’s proposed plans. The Bureau did not discharge its duty pursuant to NEPA.
Because I would reverse the grant of summary judgment to Shell as to the duty to conduct ESA consultation and NEPA analysis, I respectfully dissent.