**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALIKA ATAY; LORRIN PANG; MARK SHEEHAN; BONNIE MARSH; LEI'OHU RYDER; SHAKA MOVEMENT, (Sustainable Hawaiian Agriculture for the Keiki and the 'Aina) Movement, *Plaintiffs-Appellants*, | No. 15-16466 D.C. No. 1:14-cv-00582-SOM-BMK |

v.

COUNTY OF MAUI; MONSANTO COMPANY; ROBERT ITO FARM, INC.; HAWAII FARM BUREAU FEDERATION, MAUI COUNTY; MOLOKAI CHAMBER OF COMMERCE; AGRIGENETICS, INC.; CONCERNED CITIZENS OF MOLOKAI AND MAUI; FRIENDLY ISLE AUTO PARTS & SUPPLIES, INC.; NEW HORIZON ENTERPRISES, INC., DBA Makoa Trucking and Services; HIKIOLA COOPERATIVE; DOW AGROSCIENCES LLC; JOHN DOES 1–10; JANE DOES 1–10; DOE PARTNERSHIPS 1–10; DOE CORPORATIONS 1–10; DOE GOVERNMENT ENTITIES 1–10,
*Defendants-Appellees*.

ROBERT ITO FARM, INC.; HAWAII
FARM BUREAU FEDERATION, MAUI
COUNTY, "Maui Farm Bureau";
MOLOKAI CHAMBER OF COMMERCE;
AGRIGENETICS, INC., DBA Mycogen
Seeds; MONSANTO COMPANY;
CONCERNED CITIZENS OF MOLOKAI
AND MAUI; FRIENDLY ISLE AUTO
PARTS & SUPPLIES, INC.; NEW
HORIZON ENTERPRISES, INC., DBA
Makoa Trucking and Services;
HIKIOLA COOPERATIVE,
            *Plaintiffs-Appellees*,

            v.

COUNTY OF MAUI,
            *Defendant-Appellee*,

ALIKA ATAY; LORRIN PANG; MARK
SHEEHAN; BONNIE MARSH; LEI'OHU
RYDER; SHAKA MOVEMENT,
    *Intervenor-Defendants-Appellants.*

No. 15-16552

D.C. No.
1:14-cv-00511-
SOM-BMK

OPINION

Appeal from the United States District Court
for the District of Hawaii
Susan Oki Mollway, Chief Judge, Presiding

Argued and Submitted June 15, 2016
Honolulu, Hawaii

Filed November 18, 2016

Before: Sidney R. Thomas, Chief Judge, and Consuelo M. Callahan and Mary H. Murguia, Circuit Judges.

Opinion by Judge Callahan

## SUMMARY[*]

### Preemption

The panel affirmed the district court's summary judgment and its dismissal in two related actions pertaining to an ordinance voted into law by Maui citizens which banned the cultivation and testing of genetically engineered plants.

The panel first held that the proponents of the Maui ballot initiative and other appellants had established Article III standing based on the allegations of five individual residents who alleged that genetically engineered farming operations threatened economic harm to their farms. The panel further held that the district court did not err by denying the proponents' motion to remand their action to state court and did not err by denying the proponents' request for Rule 56(d) discovery.

The panel held that the Maui ordinance is expressly preempted by the Plant Protection Act, 7 U.S.C. § 7756(b), to the extent that it bans genetically engineered plants that the U.S. Animal and Plant Health Inspection Service regulates as plant pests. The panel held that the ban is not impliedly

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

preempted by the Plant Protection Act in its application to genetically engineered crops that the Animal and Plant Health Inspection Service has deregulated, but is impliedly preempted in this application by Hawaii's comprehensive state statutory scheme for the regulation of potentially harmful plants.

**COUNSEL**

A. Bernard Bays (argued), Leinaala L. Ley, Michael C. Carroll, and Karin L. Holma, Bays Lung Rose & Holma, Honolulu, Hawaii, for Appellants.

Richard P. Bress (argued), Matthew J. Glover, Jonathan Y. Ellis, Andrew D. Prins, and Philip J. Perry, Latham & Watkins LLP, Washington, D.C.; Margery S. Bronster (argued) and Rex Y. Fujichaku, Bronster Fujichaku Robbins, Honolulu, Hawaii; Christopher Landau, Kirkland & Ellis LLP, Washington, D.C.; Nickolas A. Kacprowski and Paul D. Alston, Alston Hunt Floyd & Ing, Honolulu, Hawaii; for Appellees.

Sylvia Shih-Yau Wu and George A. Kimbrell, Center for Food Safety, San Francisco, California; Summer Kupau-Odo and Paul H. Achitoff, Earthjustice, Honolulu, Hawaii; for Amici Curiae Center for Food Safety, Moms on a Mission (MOM) Hui, Moloka'I Mahi'ai, and Gerry Ross.

Stanley H. Abramson, Karen Ellis Carr, and Kathleen R. Heilman, Arent Fox LLP, Washington, D.C., for Amicus Curiae Biotechnology Innovation Organization.

## OPINION

CALLAHAN, Circuit Judge:

The citizens of Maui County voted into law an ordinance banning the cultivation and testing of genetically engineered (GE) plants. We must decide whether the ban is preempted by federal and state law, as the district court held below. We hold that the ordinance is expressly preempted by the Plant Protection Act, 7 U.S.C. § 7756(b), to the extent that it bans GE plants that the U.S. Animal and Plant Health Inspection Service (APHIS) regulates as plant pests. We hold that the ban is not impliedly preempted by the Plant Protection Act in its application to GE crops that APHIS has deregulated, but is impliedly preempted in this application by Hawaii's comprehensive state statutory scheme for the regulation of potentially harmful plants. We therefore affirm.

## I.

### A. Background regarding GE crops and their cultivation on Maui

Appellees include farmers and other agricultural workers, a farmer's cooperative, local businesses, Maui citizens, and several companies—including Monsanto Company and Agrigenetics, Inc.—that supply seed for GE plants. Monsanto and Agrigenetics own or lease thousands of acres of farmland in Maui County, where they farm GE seed to be used by farmers around the world and conduct field tests of GE plants regulated by APHIS, which is an agency in the U.S. Department of Agriculture. Hawaii's temperate climate and year-round growing season provide excellent conditions for farming and testing GE seeds and crops, which

Appellants—citizens and an organization concerned about the effects of GE crops and pesticides—say have made Maui "'ground zero' for the testing and development of GE crops." *See* Biotechnology Regulatory Services, APHIS, *USDA Regulation of Biotechnology Field Tests in Hawaii*, 1 (Feb. 2006), http://www.co.maui.hi.us/DocumentCenter/View/94680 (explaining that "[b]ecause of Hawaii's tropical climate . . . the State has become an attractive location for field tests of a variety of biotech crops").

GE crops are genetically modified to enhance desirable traits, including resistance to diseases, pests, and pesticides, nutritional value, shelf life, and the production of high yields in a variety of environmental conditions. Some GE plants are genetically modified to produce useful goods such as biofuel or pharmaceuticals. *See Ctr. For Food Safety v. Johanns*, 451 F. Supp. 2d 1165, 1170, 1183, 1186 (D. Haw. 2006). GE crops play a major role in the world's food supply. For example, the U.S. Department of Agriculture reports that over 90% of all corn, soybean, and cotton grown in the United States are now GE varieties.[1] In Hawaii, a GE variety of papaya that is resistant to aphid-transmitted ringspot virus is credited with saving the State's papaya industry.[2]

---

[1] *See* Economic Research Service, USDA, Adoption of Genetically Engineered Crops in the U.S., 1996–2016, http://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-us.aspx. (follow link to "Genetically engineered varieties of corn, upland cotton, and soybeans, by State and for the United States, 2000–16").

[2] *See*, *e.g.*, Tom Callis, *Papaya: A GMO Success Story*, Hawaii Tribune Herald, June 10, 2013, http://hawaiitribune-herald.com/sections/news/local-news/papaya-gmo-success-story.html.

Scientific studies have not shown that food produced from GE crops poses any inherent risk to human health. *See, e.g.*, 66 Fed. Reg. 4839, 4840 (Jan. 18, 2001) ("We have concluded that the use, or absence of use, of bioengineering in the production of a food is not a fact that is material either with respect to consequences resulting from the use of the food."). However, the cultivation and testing of GE plants raise several well-documented concerns. For example, "[b]iological contamination [of conventional crops and wild plants] can occur through pollination of non-[GE] plants by [GE] plants or by the mixing of [GE] seed with natural, or non-[GE] seed." *Geertson Seed Farms v. Johanns*, No. C 06-01075 CRB, 2007 WL 518624, at \*4 (N.D. Cal. Feb. 13, 2007) (discussing "[g]ene transmission to non-[GE] alfalfa"). This unintended gene flow is frequently referred to as "transgenic contamination." *Ctr. for Food Safety v. Vilsack*, 718 F.3d 829, 832, 841 (9th Cir. 2013).

"[I]njury [from transgenic contamination] has an environmental as well as an economic component." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010). Transgenic contamination has previously caused significant economic impacts on farmers of conventional, non-GE crops. For example, "[i]n August of 2006, it was revealed that the United States long-grain rice supply was contaminated with [GE rice], and the price of rice dropped dramatically." *In re Genetically Modified Rice Litigation*, No. 4:06 MD 1811 CDP, 2007 WL 3027580, \*1 (E.D. Mo. Oct. 15, 2007). "The market for American rice suffered significantly, in part because of the European aversion to any genetically modified foods." *Id.*; *see also Vilsack*, 718 F.3d at 832, 841 (explaining economic concerns raised by GE alfalfa).

The cultivation of GE crops also may raise environmental concerns, such as harm to beneficial plants and animals caused by the increased use of pesticides sometimes associated with testing and growing GE crops, the proliferation of "superweeds" and other pests resistant to pesticides, and the reduction of biodiversity. *See, e.g.*, *Vilsack*, 718 F.3d at 841 (explaining concerns with pesticide-resistant weeds and the increased use of pesticides associated with GE alfalfa). For example, the escape of herbicide-resistant GE plants from test fields or the contamination of wild plants with genes providing for herbicide resistance may have detrimental environmental impacts as these plants out-compete other plants, as reportedly occurred in the case of genetically modified creeping bentgrass.[3] "Biological contamination" might also raise human health concerns where, for example, GE seeds for pharmaceutical crops escape field trials and grow amid commercial crops headed to the market, as reportedly occurred in the case of GE corn designed to produce a protein to be used in pig vaccine. *See* GAO Report, *supra* n.3, at 91–92.

## B. Maui County's ban on the cultivation of GE plants

Concerned with the risks presented by the testing and cultivation of GE plants, on November 4, 2014, the voters of Maui County passed a ballot initiative enacting "A Bill

---

[3] *See* USDA, News Release No. 0350.07, USDA Concludes Genetically Engineered Creeping Bentgrass Investigation (Nov. 26, 2007), http://www.usda.gov/wps/portal/usda/usdahome?contentidonly=true&contentid=2007/11/0350.xml; U.S. Gov't Accountability Office, GAO-09-60, *Genetically Engineered Crops: Agencies are Proposing Changes to Improve Oversight, but Could Take Additional Steps to Enhance Coordination and Monitoring* 20–21 (2008), http://www.gao.gov/products/GAO-09-60.

Placing a Moratorium on the Cultivation of Genetically Engineered Organisms" (the Ordinance). Maui's effort to regulate GE crops is not unique. Hawaii County and Kauai County also have passed ordinances regulating GE crops, which are the subjects of two other legal challenges pending before our court. Amici the Center for Food Safety, *et al.* report that more than 130 statutes, regulations, and ordinances governing GE crops have been passed nationwide.

The stated purposes of Maui's Ordinance are to protect organic and non-GE farmers and the County's environment from transgenic contamination and pesticides, preserve the right of Maui County residents to reject GE agriculture, and protect the County's vulnerable ecosystems and indigenous cultural heritage. Ordinance § 4.

The Ordinance enacts a "Temporary Moratorium" making it "unlawful for any person or entity to knowingly propagate, cultivate, raise, grow or test Genetically Engineered Organisms within the County of Maui until" the Ordinance is amended or repealed. *Id.* § 5(1). On its face, as the parties agree, the Ordinance applies not only to the commercial agricultural operations like Monsanto and Agrigenetics, but also to individuals who have GMO plants in their backyards, such as a ringspot-virus-resistant GE papaya tree. The Ordinance provides exceptions only for "GE Organisms that are in mid-growth cycle," products prepared for sale that contain GE organisms, licensed health practitioners, and certain academic research. *Id.* § 5(2).

The "Temporary Moratorium" imposed by the Ordinance is more accurately characterized as a ban on the cultivation and testing of GE crops, as it will continue in effect absent amendment or repeal. The ban may be amended or repealed

only if an Environmental and Public Health Impacts Study is completed, a public hearing held, and two-thirds of the County Council approve the amendment or repeal. *Id.* § 6. Additionally, the County Council must find that the amendment or repeal will significantly benefit the County while causing no significant harm. *Id.* § 6.

The Ordinance imposes civil penalties of $10,000 for a first violation, $25,000 for a second violation, and $50,000 for additional violations. *Id.* § 9(2). Each day an individual violates the Ordinance is considered a separate violation. *Id*. The Ordinance creates criminal liability as well, with violations punishable by a $2,000 fine, imprisonment for no longer than one year, or both for each offense. *Id.* § 9(3). The Ordinance also authorizes the County's Director of Environmental Management to enter property to remove GE organisms at the violator's expense. *Id.* § 9(4). There is also a citizen suit provision that allows private suits to enjoin violations of the Ordinance. *Id.* § 9(5). Finally, the Ordinance contains a severability clause. *Id.* § 10.

## C. Procedural history

On November 12, 2014, eight days after voters passed the initiative, a group of proponents of the ballot initiative including the Sustainable Hawai`ian Agriculture for the Keiki and the `Aina Movement (collectively SHAKA) filed suit in Hawaii state court, seeking declaratory relief to resolve the Ordinance's legality (the *Atay* action).

The following day, opponents of the initiative including Appellees (collectively, the GE Parties) filed suit against Maui County in federal district court, seeking to invalidate the Ordinance (the *Robert Ito Farm* action). On November

17, 2014, following an agreement between the GE Parties and the County, the magistrate judge enjoined the County from "publishing or certifying the Ordinance, enacting, effecting, implementing, executing, applying, enforcing, or otherwise acting upon the Ordinance" until the court could determine its legality. SHAKA moved to intervene, and the district court granted the motion on December 15, 2014, noting that Maui's mayor and the County Council had publicly opposed the Ordinance prior to its passage.[4]

On December 30, 2014, the GE Parties removed the *Atay* action to federal court, where it was assigned to Chief Judge Mollway, the same judge assigned the *Robert Ito Farm* action. SHAKA filed a motion to remand back to state court, which the district court denied.

On June 30, 2015, the district court granted the GE Parties' motion for summary judgment filed in the *Robert Ito Farm* action and granted the County's motion to dismiss filed in the *Atay* action. *Robert Ito Farm, Inc. v. Cty. of Maui*, 111 F. Supp. 3d 1088 (D. Haw. 2015). The district court found the Ordinance unenforceable because it was expressly and impliedly preempted by federal law, impliedly preempted by state law, and in excess of the County's authority under the Maui County Charter. *Id.* at 1100–14.

SHAKA appealed the district court's judgment in both cases. On appeal, SHAKA, the GE Parties, and two groups

---

[4] The district court denied a motion to intervene filed by Moms on a Mission Hui, Moloka'i Mahi'ai, Gerry Ross, and the Center for Food Safety. This denial is the subject of a separate appeal, *Robert Ito Farm, Inc. v. County of Maui*, No. 15-15246, which we resolve in a concurrently filed opinion.

of amici filed briefs, while Maui County filed a statement of no position.

## II.

## A.  The Parties' threshold arguments

We first address several threshold arguments raised by the Parties.  Appellees argue that Appellants lack standing to maintain this appeal.  SHAKA contends that the district court erred by refusing to remand the *Atay* action to state court and denying their request for Rule 56(d) discovery on the scope of regulations affecting GE crops.  We reject these arguments.[5]

### 1.  Appellants have standing.

The GE Parties have moved to dismiss for lack of appellate jurisdiction, arguing that SHAKA and other Appellants "lack independent standing to defend the constitutionality of the ordinance where the relevant public officials have chosen not to."

Article III of the U.S. Constitution limits federal courts' power to deciding actual "cases" or "controversies."  U.S. Const., Art. III, § 2.  One element of the Constitution's case-or-controversy requirement is that a litigant must demonstrate

---

[5] We also reject SHAKA's argument that the district court abused its discretion in denying SHAKA's motion to certify the state law issues presented to the Hawaii Supreme Court.  As explained in our concurrently filed opinion in *Syngenta Seeds, Inc. v. County of Kauai*, Nos. 14-16833, 14-16848, certification is not merited because the implied state preemption analysis under Hawaii law is well-defined.

standing to sue. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013). The standing requirement is built on separation-of-powers principles; it "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* The standing requirement "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (internal quotation marks omitted). To establish Article III standing, a litigant must demonstrate an injury that is "'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper*, 133 S. Ct. at 1147 (quoting *Monsanto*, 561 U.S. at 149). "As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

The GE Parties' standing challenge relies primarily on *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2660 (2013), where the Supreme Court held that the proponents of California's Proposition 8 lacked standing to defend the Proposition after state officials refused to do so. The Court reasoned that the intervenors had "no 'direct stake' in the outcome of their appeal," and "[t]heir only interest . . . was to vindicate the constitutional validity of a generally applicable California law." *Id.* at 2662. The GE Parties contend that "*Hollingsworth* establishes a bright-line rule: The only party with a cognizable interest in defending the constitutionality of a generally applicable law is the government, and the only persons permitted to assert that interest in federal court, accordingly, are the government's officials or other agents." The GE Parties argue that *Diamond v. Charles*, 476 U.S. 54,

66 (1986), which held that a private doctor lacked standing to defend the constitutionality of a state abortion law that the state refused to defend, lends further support to this rule.

The GE Parties overlook a key aspect of the Supreme Court's standing analysis for initiative proponents turned intervenors: Such intervenors can establish standing if they can do so independently of their status as ballot initiative proponents. For example, in *Hollingsworth*, the Court specifically noted that the intervenors did not have "a judicially cognizable interest *of their own*," and "have likewise not suffered an injury in fact." 133 S. Ct. at 2663–64 (emphasis added). Similarly, in *Diamond*, although the Court reasoned that Diamond "could not compel the State to enforce" the restrictions on abortion even if they were determined to be constitutional, the Court went on to analyze Diamond's independent allegations of standing. 476 U.S. at 64–67 ("Even if there were circumstances in which a private party would have standing to defend the constitutionality of a challenged statute, this is not one of them. Diamond is not able to assert an injury in fact."). Again, in *Arizonans for Official English v. Arizona*, 520 U.S. 43, 65 (1997), the Court analyzed the intervenors' standing separately from their status as proponents of a law. Without definitively resolving the issue, the Court expressed "grave doubts" as to the intervenors' independent standing because their "requisite concrete injury . . . [was] not apparent." *Id*. at 66.

Thus, although SHAKA and the other Appellants' status as ballot initiative proponents and intervenors does not afford them standing, they may be able to show standing independently.

We find that the SHAKA Appellants have done so based on the allegations of the five individual Appellants—Alika Atay, Mark Sheehan, Bonnie Marsh, Lei`ohu Ryder, and Lorrin Pang. Alika Atay and Mark Sheehan are Maui residents who allege that GE farming operations on Maui, including Monsanto's, threaten economic harm to their organic, non-GE farms. They allege that transgenic contamination and the drift of wind-borne pesticides threaten to wipe out their customer base, who will not purchase GE food. They contend that they have had to change their conduct because of GE farming operations. For example, Mr. Sheehan states that he was forced to locate his farming operations on Maui's North Shore, but that even there he suffers a risk of transgenic contamination and pesticide exposure. Mr. Atay, who employs "natural farming techniques" that require the collection of wild plants and microorganisms, states that he has been prevented from gathering local plants to use in his operations from areas nearby GE farms, due to the risk of genetic contamination. These allegations of concrete harms caused by GE farming operations satisfy the injury-in-fact requirement. Indeed, the Supreme Court has held that actions conventional alfalfa farmers planned to take because of *anticipated* "contamination" from GE alfalfa seed demonstrated injury in fact. *Monsanto*, 561 U.S. at 154. These harms are also redressable by a decision favorable to Appellants upholding Maui's ban on GE crops. Given the Ordinance's citizen suit provision, the possibility that the County would decline to enforce the Ordinance does not undermine our finding of redressability.

Appellants' standing is also established based on allegations regarding environmental and recreational harms caused by pesticides used on GE farms. Lei`Ohu Ryder

alleges that she would like to swim in the waters near Monsanto's fields but refrains from doing so because she fears pesticide contamination. Her feared risk of harm cannot be dismissed as lacking credibility at the summary judgment stage given that, as Appellants assert, these waters have been polluted by pesticide-laden storm runoff from Monsanto's fields in the past. Ms. Ryder further alleges that her home is located close to Monsanto's fields, and she fears damaging health effects from drifting pesticides. These are specific, reasonable allegations that GE farming operations directly injure the affiants' recreational interests and health that, at the summary judgment stage, suffice to show injury in fact. Indeed, the Supreme Court has held that similar "conditional statements—that [the affiants] would use the nearby North Tyger River for recreation if [defendants] were not discharging pollutants into it," were sufficient to show injury in fact. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.(TOC), Inc.*, 528 U.S. 167, 183–84 (2000). Again, the affiants' asserted injuries are redressable by a decision in Appellants' favor.

We therefore conclude that Appellants have established Article III standing and deny the GE Parties' motion to dismiss.

### 2. The district court did not err in denying SHAKA's motion to remand to state court.

SHAKA argues that the district court erred in refusing to remand back to state court the *Atay* action, which alleged only state law claims for declaratory relief. We review the district court's denial of the motion to remand for lack of removal jurisdiction de novo. *United Computer Sys., Inc. v. AT & T Corp.*, 298 F.3d 756, 760 (9th Cir. 2002).

A state civil action is removable to federal court if the federal court could have exercised original jurisdiction. 28 U.S.C. § 1441(a).  In general, a state court action may not be removed to federal court on the basis of an anticipated federal defense, including federal preemption.  *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 947 (9th Cir. 2014) (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)).  However, declaratory judgment cases operate under a different rule:  "Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court."  *Pub. Serv. Comm'n of Utah v. Wycoff Co. Inc.*, 344 U.S. 237, 248 (1952); *see Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014).

Here, SHAKA filed the *Atay* action in state court in anticipation of the GE Parties' federal suit.  Indeed, SHAKA stated in its complaint that it filed suit due to the "threat of imminent and inevitable litigation regarding" the Ordinance's legality.  SHAKA attempts to distinguish the rule set forth in *Public Services Commission of Utah* by arguing that the County is the defendant in both actions.  However, as the district court recognized in granting SHAKA's motion to intervene, SHAKA is in effect standing in for the County as the defendant in the *Robert Ito Farm* action.  In these circumstances, it is the character of the *Robert Ito Farm* action, in which questions of federal preemption are front and center, that determines whether there is federal question jurisdiction.  *Id.*  Therefore, the district court did not err in denying SHAKA's motion to remand.

### 3.   The district court did not err in denying SHAKA's request for Rule 56(d) discovery.

SHAKA also argues that the district court improperly cut off discovery on state and federal regulation of GE crops in Maui County before ruling on the preemption arguments presented in the GE Parties' summary judgment motion.

Under Rule 56(d), when "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). The burden is on the party seeking a Rule 56(d) continuance "to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001). We review the district court's denial of discovery for abuse of discretion. *Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 775 (9th Cir. 2003).

The district court did not abuse its discretion in concluding that SHAKA had failed to show that additional facts were essential to its ability to oppose summary judgment on preemption grounds. As we have recognized, "[p]reemption is predominantly a legal question, resolution of which would not be aided greatly by development of a more complete factual record." *Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1513 (9th Cir. 1993) (citing *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 201 (1983)). The

preemption questions raised in this case are no different, and can be resolved without further development of background facts.

## B. Federal preemption

The GE Parties advance two arguments that Maui's ban on the cultivation and testing of GE plants is preempted by federal law. First, they argue that the Ordinance is expressly preempted by the Plant Protection Act (PPA), 7 U.S.C. § 7756(b), in its application to plants that APHIS regulates as plant pests. Second, they contend that the Ordinance is impliedly preempted in its entirety because it frustrates the PPA's purposes and objectives. We address each argument in turn after summarizing federal preemption principles and the federal regulatory scheme governing GE plants.[6]

### 1. Overview of Federal Preemption Principles

The Supremacy Clause makes the laws of the United States "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. "Put simply, federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1297 (2016). Federal judges, of course, are not constitutionally charged with making federal law. Rather, that is primarily the role of Congress and it is thus "Congress rather than the courts that preempts state law." *Chamber of Commerce of U.S. v.*

---

[6] Our review of the district court's decision regarding preemption and its interpretation and construction of a federal statute is de novo. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

*Whiting*, 563 U.S. 582, 607 (2011). Our task as judges "is to ascertain Congress' intent in enacting the federal statute at issue," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983), which "is the ultimate touchstone in every pre-emption case," *Hughes*, 136 S. Ct. at 1297.

Congress' intent to preempt state and local law may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks omitted). In other words, federal preemption "may be either express or implied." *Shaw*, 463 U.S. at 95. Where the intent of a statutory provision that speaks expressly to the question of preemption is at issue, "we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1946 (2016) (internal quotation marks omitted).

Absent an express congressional command, a state law is preempted if it actually conflicts with federal law or if federal law so thoroughly occupies a legislative field that it is unreasonable to infer that Congress intended for supplemental state or local regulation. *Cipollone*, 505 U.S. at 516. A conflict giving rise to preemption exists "where it is impossible for a private party to comply with both state and federal law, . . . and where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (alterations and internal citations omitted). What is a sufficient "obstacle" to give rise to implied preemption is a matter of judgment to be

informed by examining the federal statute as a whole and identifying its purpose and intended effects.  *Id.* at 373. Particularly where a statute regulates a field traditionally occupied by states, such as health, safety, and land use, a "presumption against preemption" adheres. *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009).  We assume that a federal law does not preempt the states' police power absent a "clear and manifest purpose of Congress." *Id.* at 565 (internal quotation marks omitted).

"[A]n agency regulation with the force of law [also] can pre-empt conflicting state requirements." *Id*. at 576.  Only specific agency rules carrying the force and effect of federal law may give rise to conflict preemption, however, not "agency proclamations of pre-emption." *Id.*; *see also City of New York v. FCC*, 486 U.S. 57, 63 (1988).  We determine whether an agency's rule has the force and effect of law "under the standard set forth in *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001), and its progeny." *Reid v. Johnson & Johnson*, 780 F.3d 952, 964 (9th Cir. 2015).  The latter category of agency pronouncements about the impact of state and local law on federal statutory objectives is entitled to "some weight" though, weight proportional to its power to persuade. *Wyeth*, 555 U.S. at 577; *cf. Mead Corp.*, 533 U.S. at 234–35; *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

## 2.  The federal regulatory scheme governing GE plants

As we explained in *Vilsack*, 718 F.3d at 833–36, three federal agencies regulate GE plants:  the Food and Drug Administration, the Environmental Protection Agency, and

the U.S. Department of Agriculture, through APHIS. Only APHIS's regulation under the PPA is at issue here.

Congress enacted the PPA in 2000 to protect against harms to "the agriculture, environment, and economy of the United States" caused by "plant pests" and "noxious weeds," while facilitating commerce in non-dangerous plants.[7] 7 U.S.C. § 7701(1), (3), (5). In service of this goal, the PPA prohibits the movement of plant pests except with a permit. *Id.* § 7711(a). The PPA further authorizes the Secretary of Agriculture, and by delegation APHIS, to prohibit or restrict the movement in interstate commerce of plants and other products as "necessary to prevent the introduction . . . or the dissemination of a plant pest or noxious weed within the United States." *Id.* § 7712(a); *see also id.* § 7712(f).

A "plant pest" is defined as any of eight types of listed organisms that "can directly or indirectly injure, cause damage to, or cause disease in any plant or plant product." *Id.* § 7702(14). Environmental and economic harm associated with transgenic contamination caused by GE plants is not "plant pest injury" that the PPA requires APHIS to protect against. *Vilsack*, 718 F.3d at 833. However, "a genetically modified organism is regulated as a plant pest if it is created using an organism that is itself a plant pest," *id.* at 835 (citing 7 C.F.R. § 340.1), or if APHIS "has reason to believe [that it] is a plant pest," 7 C.F.R. § 340.1; *Vilsack*, 718 F.3d at 835, 840. Such GE plants are called "regulated articles" or "presumptive plant pests." *Id.* at 833; *see* 7 C.F.R. § 340.0(a) & n.1; *id.* § 340.1 (definition of

---

[7] The PPA consolidated and built upon preexisting statutes and implementing regulations governing plant pests and noxious weeds. *See Vilsack*, 718 F.3d at 834 (explaining statutory history).

"regulated article"); *id.* § 340.2 (groups of organisms that are or contain plant pests).

Such GE plants are regulated as plant pests "until the agency concludes on the basis of scientific evidence that the modified plant is not a 'plant pest.'" *Vilsack*, 718 F.3d at 835. Accordingly, with narrow exceptions, APHIS's regulations prohibit the introduction—including the movement through the United States and "use . . . outside the constraints of physical confinement that are found in a laboratory, contained greenhouse, . . . or other contained structure," 7 C.F.R. § 340.1—of regulated articles without APHIS's permission. *Id.* § 340.0(a).

APHIS's permitting process imposes strict conditions on any field test or other approved release into the environment in order to prevent the dissemination of regulated articles. *Id.* §§ 340.3(c) (providing performance standards), 340.4(f) (providing general permit conditions, which are in addition to permit-specific conditions). Approved field trials are subject to ongoing inspections by USDA inspectors, *id.* §§ 340.3(d)(6), 340.4(d), and APHIS requires a series of reports regarding the trials, *id.* §§ 340.3(d)(4), 340.4(f)(9).

Any party who believes that a certain regulated article is unlikely to pose a risk as a plant pest may petition APHIS for a determination of nonregulated status of the article. *Id.* § 340.6(a). To succeed in such a petition, an applicant must demonstrate, through an extensive evaluation process involving data collected from APHIS-authorized field tests and other experiments, that the regulated article is no more likely to cause plant pest harms than its non-GE counterpart. *See Vilsack*, 718 F.3d at 835; 7 C.F.R. § 340.6(c). The decision-making process typically involves analysis pursuant

to the National Environmental Policy Act.  *See Vilsack*, 718 F.3d at 832, 837.  If APHIS grants the petition, APHIS no longer has jurisdiction to regulate the plant or other article. *Id*. at 842.

> **3.  The Ordinance is expressly preempted by the PPA to the extent that it seeks to ban GE plants that APHIS regulates as plant pests.**

Congress included an express preemption provision in the PPA.  The provision states in relevant part that "no State or political subdivision of a State may regulate the movement in interstate commerce of any . . . plant, . . . plant pest, noxious weed, or plant product in order to control . . . , eradicate . . . , or prevent the introduction or dissemination of a . . . plant pest, or noxious weed, if the Secretary has issued a regulation or order to prevent the dissemination of the . . . plant pest, or noxious weed within the United States."    7 U.S.C. § 7756(b)(1).[8]  Three conditions thus must be met for a local law to be preempted:   (1) the local law must regulate "movement in interstate commerce," (2) it must be intended to "control . . . , eradicate . . . , or prevent the introduction or dissemination of a . . . plant pest, or noxious weed," and (3) APHIS must regulate the plant at issue as a plant pest or noxious weed.  Each condition is met here.

---

[8] The preemption provision contains exemptions for (A) regulations consistent with and not in excess of federal regulation and (B) states or political subdivisions that demonstrate a "special need" to the Secretary of Agriculture.  7 U.S.C. § 7756(b).  These exemptions are not applicable here because the Ordinance exceeds federal regulation and the County did not attempt to demonstrate a "special need."

First, the Ordinance regulates "movement in interstate commerce" by banning all testing, planting, or cultivation of GE plants to prevent their introduction or dissemination. Under the PPA, "movement" is defined broadly and expressly includes a plant's "release into the environment," *id.* § 7702(9)(E), such as open-air field testing of GE plants. 7 C.F.R. § 340.1 (defining "release into the environment"). Experimental GE plants grown on test fields in Maui are without doubt involved in interstate commerce. Setting aside the global market for GE seed crops, seeds and other organisms carried afield by wind or other vectors "do not acknowledge State lines." 52 Fed. Reg. 22,892, 22,894 (June 16, 1987). Maui's Ordinance itself states that GE crops impact "foreign markets" and "even a single event of Transgenic Contamination can and has resulted in significant economic harm when the contaminated crops are rejected by buyers." Ordinance § 2(14). The Ordinance is expressly designed to "defend and promote the economic integrity of organic and non-GE markets that are harmed by transgenic contamination by GE Operations and Practices." *Id*. § 4(2).

While the phrase "movement in interstate commerce" within the meaning of the PPA's preemption clause may be narrower than the full scope of Congress's Commerce Clause power, *see Circuit City Stores Inc. v. Adams*, 532 U.S. 105, 118 (2001), we find that the phrase encompasses federally regulated GE crops grown in Hawaii. SHAKA's narrower interpretation, which would limit the scope of the preemption clause to local laws addressing plants that are in the act of traveling to or through at least one other state, is less consistent with the statute's larger context and purpose, which clearly envisions the dissemination of plants and seeds from fields as implicating movement in interstate commerce. *See, e.g.*, 7 U.S.C. § 7711(a). Indeed, Congress expressly

recognized in the PPA that "all plant pests, noxious weeds, plants, plant products, articles capable of harboring plant pests or noxious weeds regulated under this chapter are in or affect interstate commerce." *Id.* § 7701(9).

Second, the Ordinance was passed in order to "control . . . , eradicate . . . , or prevent the introduction or dissemination of a . . . plant pest, or noxious weed." *Id.* § 7756(b)(1). An express purpose of the Ordinance is to prevent the spread of GE plants. Ordinance § 4(1)–(2); *see also id.* § 2(3) (stating that "GE Organisms . . . exist in the County as a possible invasive species"). The Ordinance implements this purpose by banning almost all planting and testing of GE plants. *Id*. § 5. The Ordinance states that existing governmental oversight of GE plants is "inadequate" to achieve this purpose. *Id.* § 2(9).

SHAKA argues that the second preemption condition is not met because the Ordinance seeks to control GE plants in order to prevent harms associated with transgenic contamination and pesticides, which are not "plant pest harms" within the meaning of the PPA. *Vilsack*, 718 F.3d at 839. What matters under the preemption clause, however, is whether a local law seeks to control, eradicate, or prevent the introduction or dissemination of plants that APHIS regulates as plant pests. The fact that APHIS regulates such plants for reasons other than second-order concerns that motivated the local law, such as concern with transgenic contamination, is irrelevant as far as the express preemption clause is concerned. To hold otherwise would allow state and local governments to subvert the preemption clause by "simply publishing a legislative committee report articulating some [] interest or policy" other than preventing plant pest harms that would be furthered by a proposed law banning plant pests.

*See Perez v. Campbell*, 402 U.S. 637, 652 (1971); *cf. Puente Arizona v. Arpaio*, 821 F.3d 1098, 1106 (9th Cir. 2016) ("If Congress intended to preempt laws like the one challenged here, it would not matter what Arizona's motives were; the laws would clearly be preempted."). Thus, a local law's purpose matters to the preemption analysis under 7 U.S.C. § 7756(b)(1) only to the extent that the local law must be intended to control plants that APHIS regulates as plant pests, rather than having only an incidental effect on such plants. Under the PPA's preemption clause, state and local governments may not supplement the strict controls that apply to federally regulated plant pests without APHIS's approval.

Third, APHIS has issued regulations in order to prevent the dissemination of the class of plant pests at issue, GE crops. *See* 7 C.F.R. Part 340. SHAKA's argument that the third preemption condition is not met because GE plants are regulated articles, not plant pests, is unavailing. APHIS deems nearly all GE plants to be plant pests because nearly all GE plants are created using *Agrobacterium*, which is a listed plant pest. 7 C.F.R. § 340.2(a). If a GE plant is made with *Agrobacterium* or another plant pest listed in § 340.2, APHIS considers it to be a plant pest. *Id*. § 340.0 n.1; 51 Fed. Reg. 23,352, 23,355 (June 26, 1986) ("USDA believes that an organism or product *is a plant pest* if the donor, recipient, vector or vector agent of the genetically engineered organism or product comes from a member of one of the groups listed in § 340.2." (emphasis added)); 52 Fed. Reg. at 22,895 ("[T]he definition of plant pest was deliberately made broad by Congress to include those organisms that might later be found to be injurious to plants."); *id*. at 22,893–94. We explained this in *Vilsack*—"*a genetically modified organism*

*is regulated as a plant pest* if it is created using an organism that is itself a plant pest." 718 F.3d at 835 (emphasis added).

APHIS may also regulate GE plants that were not made with a listed plant pest if they "are believed to be plant pests." 7 C.F.R. § 340.0 n.1. According to the GE Parties, this class of regulated articles is not at issue here. Even if such presumptive plant pests are at issue, however, SHAKA is incorrect in asserting that presumptive plant pests are merely "regulated articles" and not plant pests for the purposes of the preemption clause. The regulations indicate that all regulated articles are considered to be plant pests. *See* 7 C.F.R. § 340.0(b) (equating "regulated article" with "plant pest"). Strict regulations apply to all plant pests—presumed or listed—up until the point they are deregulated, at which point they fall outside of the preemption clause and APHIS's jurisdiction under the PPA. *See Vilsack*, 718 F.3d at 841. Indeed, accepting the view that presumed plant pests are not plant pests could create a regulatory paradox. If such plants were not considered plant pests or noxious weeds under the PPA, APHIS presumably would have no power to regulate or deregulate them. No party takes this position in this case.

We conclude that the Ordinance is expressly preempted by the PPA to the extent that it seeks to ban GE plants that APHIS regulates as plant pests. The Ordinance seeks to regulate "the movement in interstate commerce" of plant pests "in order to control . . . , eradicate . . . , or prevent the introduction or dissemination of . . . plant pest[s]" that APHIS regulates extensively. 7 U.S.C. § 7756(b)(1).

## 4. The Ordinance is not impliedly preempted.

The PPA's express preemption clause only preempts the Ordinance in its application to plants regulated by APHIS as plant pests, not plants that APHIS has deregulated and thus has no authority over. However, the GE Parties argue, and the district court held below, that the Ordinance is also impliedly preempted by the PPA in its application to deregulated, "commercialized" GE crops.[9] *See Robert Ito Farm*, 111 F. Supp. 3d at 1106–07. The GE Parties contend that the Ordinance's ban on deregulated GE crops impermissibly frustrates the PPA's purpose of facilitating commerce in non-dangerous plants, while protecting the nation from dangerous plant pests and noxious weeds. We disagree.

We begin our search for implied preemptive intent by observing the PPA's express preemption clause creates a "reasonable inference" that Congress did not intend to preempt state and local laws that do not fall within the clause's scope. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995); *see also Cipollone*, 505 U.S. at 517 (holding that a court should not consider implied theories of preemption where an express preemption clause "provides a reliable indicium of congressional intent with respect to state authority") (internal quotation marks omitted). As the GE Parties concede, the Ordinance's application to federally deregulated GE crops does not fall within the PPA's express preemption clause. The resultant "reasonable inference" that

---

[9] A different judge rejected the same argument in reviewing a similar ban on GE crops imposed by Hawaii County. *Hawai'i Floriculture & Nursery Ass'n v. Cty. of Hawaii*, No. Civ. 14-00267 BMK, 2014 WL 6685817, at *9–10 (D. Haw. Nov. 26, 2014).

Congress did not intend to preempt the Ordinance might be overcome, of course.  Thus, for example, a local law that is consistent with an express preemption clause may still be preempted if it "actually conflicts" with federal law.  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 871 (2000).  However, the GE Parties have not shown any actual conflict between the Ordinance's ban on federally deregulated GE crops and any federal statutory or regulatory provision.  Indeed, at APHIS's urging, we held in *Vilsack* that APHIS "no longer had jurisdiction to continue regulating" a GE plant once APHIS decided to deregulate it.  718 F.3d at 832.

Nor have the GE Parties shown more broadly that the Ordinance impermissibly frustrates any federal objective by banning federally deregulated, "commercialized" GE crops. The Supreme Court has warned that obstacle preemption analysis does "not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives[, because] such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law."  *Whiting*, 563 U.S. at 607 (internal quotation marks omitted).  The Court's "precedents establish that a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Id*. (internal quotation marks omitted).

Even assuming that an obstacle preemption analysis is called for because the PPA's express preemption provision does not "provide[] a reliable indicium of congressional intent with respect to state authority," *Cipollone*, 505 U.S. at 517 (internal quotation marks omitted), the high threshold

required for preemption is not met here.[10]  Nothing in the PPA suggests that Congress intended to prevent state and local governments from exercising their traditional authority over agricultural land use with respect to certain crops simply because APHIS deregulated them.  To hold otherwise would have the backwards effect of preventing states and local governments from regulating crops formerly considered to be plant pests, even though states and local governments may regulate conventional crops that were never considered plant pests and raise fewer concerns.  Such a holding would have far-reaching practical effects.  Because a large percentage of commercial crops grown in the United States are GE crops, states and counties across the nation would be prevented from regulating an enormous swath of agriculture.  We do not believe that Congress so intended.

To hold otherwise would also leave a gap in the regulation of GE Plants.  We held in *Vilsack* that "APHIS . . . has no power to regulate the adverse economic effects that could follow [a GE crop's] deregulation," including due to transgenic contamination.  718 F.3d at 841.  We find no indication, clear or otherwise, that Congress intended to prevent states from closing this regulatory gap.  Indeed, the GE Partes ultimately concede that "[a]n appropriate local entity . . . might be able to fill gaps in the federal regime to address these issues."  There is nothing in the PPA or its implementing regulations suggesting that a local government

---

[10] As has the Supreme Court, "[w]e recognize, of course, that the categories of preemption are not rigidly distinct," and what might be understood as an obstacle preemption argument might instead be understood as a field preemption argument.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (internal quotation marks omitted).

could not choose to do so by prohibiting the cultivation of commercialized GE crops in a particular area.

We acknowledge that statements made in the introduction to the White House Office of Science and Technology Policy's "Proposal for Coordinated Framework for Regulation of Biotechnology," 49 Fed. Reg. 50,856 (Dec. 31, 1984), recognized the importance of "achieving national consistency" in the regulation of biotechnology. Such a policy statement in the introduction of a policy document certainly does not have the force and effect of law and thus its own preemptive effect. *See Wyeth*, 555 U.S. at 576; *Reid*, 780 F.3d at 964. The statement also has little power to persuade. The statement's passing nature does not evince thoroughness of consideration, and it was not even repeated in the finalized framework. *See* 51 Fed. Reg. 23,302 (June 26, 1986). The statement also was not issued by APHIS, the agency charged with implementing the PPA. Moreover, the statement is not entirely consistent with later pronouncements. The statement is at odds with Congress's subsequent enactment of the PPA's express preemption clause, which does not require national consistency in the regulation of commercialized GE crops. Additionally, APHIS subsequently has stated that "the issuance of final rules does not per se prohibit State regulation of the intrastate movement of genetically engineered plants." 58 Fed. Reg. 17,044, 17,053 (Mar. 31, 1993). Rather, the agency explained, "State regulations would be preempted only if they are inconsistent with any Federal orders or regulations promulgated pursuant to those Acts." *Id.* These statements are consistent with the scope of the PPA's express preemption clause. Again, a county's prohibition on the growing of GE crops in a particular area is not inconsistent with any federal regulation under the PPA to the extent the

bans apply to plants that are no longer regulated under the PPA.

Accordingly, we hold that the PPA does not impliedly preempt the Ordinance in its application to GE crops that APHIS has deregulated. The regulation of commercialized crops, both of GE and traditional varieties, remains within the authority of state and local governments.

## C.  State preemption

We have held that federal law preempts the Ordinance in its application to GE plants that APHIS regulates as plant pests, but not in its application to federally deregulated, commercialized GE plants. However, we find that Hawaii state law impliedly preempts the Ordinance in its remaining application to commercialized GE plants and thus affirm the district court's decision.[11]

As explained in our concurrently filed opinion in *Syngenta v. County of Kauai*, No. 14-16833, Hawaii courts apply a "'comprehensive statutory scheme' test" to decide field-preemption claims under HRS § 46-1.5(13), such as that made by the GE Parties here. Under this test, a local law is preempted if "it covers the same subject matter embraced within a comprehensive state statutory scheme disclosing an express or implied intent to be exclusive and uniform throughout the state." *Richardson v. City & Cty. of Honolulu*, 868 P.2d 1193, 1209 (Haw. 1994). Courts frequently treat

---

[11] We agree with the district court in *Syngenta Seeds, Inc. v. County of Kauai*, that the scope of federal preemption delineates the breadth of state field preemption in this case. No. Civ. 14-00014 BMK, 2014 WL 4216022, at \*9 n.11 (D. Haw. Aug. 25, 2014).

this test as involving several overlapping elements, including showings that (1) the state and local laws address the same subject matter; (2) the state law comprehensively regulates that subject matter; and (3) the legislature intended the state law to be uniform and exclusive.  However, as is true of our federal preemption analysis, the "critical determination to be made" is "whether the statutory scheme at issue indicate[s] a legislative intention to be the exclusive legislation applicable to the relevant subject matter."  *Pac. Int'l Servs. Corp. v. Hurip*, 873 P.2d 88, 94 (Haw. 1994) (internal quotation marks omitted).

We begin by summarizing Hawaii law regulating potentially harmful plants and then we apply Hawaii's comprehensive statutory scheme test.

### 1.  Hawaii law regulates the importation, transportation, sale, control, and eradication of potentially harmful plants.

As an isolated island chain with a large number of endemic species and "more threatened and endangered species per square mile than any other place on earth," *USDA Regulation of Biotechnology Field Tests in Hawaii*, *supra*, at 1, Hawaii is perhaps more threatened by invasive species than any other state.  Its history with human-introduced invasive species is long and, as history has shown, well-intentioned fixes to the problem have sometimes proven colossally uninformed.  An infamous example occurred in 1883, when sugarcane farmers imported mongooses to control invasive

rats that plagued Maui and other islands.[12]  It turned out that rats are nocturnal and mongooses are diurnal, and thus the mongooses mostly hunted other prey, ravaging native bird populations and becoming a widespread problem that, like the rats, persists today.  Introduced animals are not the only threat.  As a group of biologists observed, "[t]he problem of introduced plants is especially significant in Hawaii."[13]

To address the threat posed by introduced, potentially harmful plants, Hawaii has promulgated five chapters of Hawaii law.  The State also coordinates closely with APHIS with respect to plants within APHIS's jurisdiction.  *See USDA Regulation of Biotechnology Field Tests in Hawaii*, *supra*, at 2 ("Hawaii is one of the most active States when it comes to providing input on field test applications.").

In relevant part, Chapter 141 (titled the Department of Agriculture) authorizes the Hawaii Department of Agriculture (DOA) to enact rules regulating potentially harmful plants, including:

> The introduction, transportation, and propagation of . . . plants; . . . The quarantine, inspection, . . . destruction, or exclusion, either upon introduction into the State, or at

---

[12] *See Mongoose*, Hawaii Invasive Species Council, http://dlnr.hawaii.gov/hisc/info/invasive-species-profiles/mongoose/ (last vistied Sept. 2, 2016).

[13] David Pimentel, Lori Lach, Rodolfo Zuniga, & Doug Morrison, *Environmental and Economic Costs Associated with Non-Indigenous Species in the United States*, Cornell Chronicle, Cornell University (Jan. 24, 1999), http://www.news.cornell.edu/stories/1999/01/environmental-and-economic-costs-associated-non-indigenous-species.

> any time or place within the State, of any . . . seed . . . or any other plant growth or plant product . . . that is or may be in itself injurious, harmful, or detrimental to the [agricultural or horticultural industries or the forests of the State]; [and] The manner in which . . . research activities may be undertaken.

Haw. Rev. Stat. (HRS) § 141-2. Chapter 141 also requires the DOA to establish "pest designations," subject to a limited exception for "incipient infestation[s]" requiring "immediate action." *Id.* § 141-3. The DOA must "develop and implement a detailed control or eradication program for any pest designated." *Id.* § 141-3.5. Additionally, the DOA must "so far as reasonably practicable, assist, free of cost to individuals, in the control or eradication of . . . noxious weeds, or other pests injurious to the environment or vegetation of value."[14] *Id.* § 141-3.

Chapter 150 (the Hawaii Seed Law) addresses the sale of agricultural and vegetable seeds. Among other restrictions, the law prohibits the sale of such seeds if they are contaminated by noxious weed seeds in excess of established tolerances. *Id.* § 150-23. The law authorizes the DOA to designate noxious weed seed by rule. *Id.* § 150-22; *see also id.* § 150-21 (defining "noxious weed seed").

Chapter 150A (the Hawaii Plant Quarantine Law) prohibits importation of "restricted plants" without a permit,

---

[14] "Control . . . means to limit the spread of a specific noxious weed and to reduce its density to a degree where its injurious, harmful, or deleterious effect is reduced to a tolerable level." HRS § 152-1.

and directs the DOA to designate restricted plants by rule. *Id.* § 150A-6.1(a), (b). Such plants include designated noxious weeds and other "specific plants that may be detrimental or potentially harmful to agriculture, horticulture, the environment, . . . or public health." *Id.* § 150A-6.1(b). Pursuant to its authority, the DOA has enacted restrictions on several disease-carrying commercial crops. Haw. Admin. R. (HAR) §§ 4-72-6, 4-72-9–4-72-12. The Hawaii Plant Quarantine Law also authorizes the DOA to "regulate or prohibit the sale [within the State] of . . . restricted plants." HRS § 150A-6.1(c). The law prohibits the sale and importation of noxious weeds, however, except for research with a permit issued by the DOA. *Id.* § 150A-6.1(d). Furthermore, the law prohibits the transportation within the State of any "flora specified by rules and regulations of [the DOA] except by a permit." *Id.* § 150A-8. The law also creates "an advisory committee on plants and animals," which is comprised of certain officials and other members who "are thoroughly conversant with modern ecological principles and the variety of problems involved in the adequate protection of [the State's] natural resources." *Id.* § 150A-10. The committee is charged with "advising the department in problems relating to the introduction, confinement, or release of plants, animals, and microorganisms." *Id*.

Chapter 152 also addresses noxious weeds. HRS § 152-3 prohibits the introduction or transportation of "specific noxious weeds or their seeds or vegetative reproductive parts into any area designated . . . as free or reasonably free of those noxious weeds," except as permitted for educational or research purposes. Chapter 152 authorizes the DOA to designate noxious weeds and to cooperate with landowners for their control or eradication. *Id.* §§ 152-2, 152-4, 152-6;

*see* HAR §§ 4-68-3–4-68-8 (criteria for noxious weed designation).

Finally, Chapter 194 establishes an invasive species council to provide "policy level direction, coordination, and planning among state departments, federal agencies, and . . . local initiatives for the control and eradication of harmful and invasive species." HRS § 194-2(a).[15]

In sum, Hawaii law establishes a regime for the regulation of "restricted" or "noxious" plants, i.e., "any plant species which is, or which may be likely to become, injurious, harmful, or deleterious to the agricultural, horticultural, aquacultural, or livestock industry of the State and to forest and recreational areas and conservation districts of the State, as determined and designated by the department from time to time." *Id.* § 152-1; *see also id.* § 150-21 (defining "noxious weed seed"); *id.* § 150A-6.1 (defining "restricted plants").

## 2.  The Ordinance and Hawaii law address the same subject.

Maui's GE Plant Ordinance addresses the same subject matter as the statutes above—the regulation of potentially harmful plants and invasive species. *See, e.g.*, HAR §§ 4-72-6, 4-72-9–4-72-12.

The fact that no state statute or DOA rule specifically mentions GE crops does not foreclose a finding of implied

---

[15] As explained in our concurrently filed opinion in *Syngenta Seeds, Inc. v. County of Kauai*, Nos. 14-16833, 14-16848, Hawaii also has a comprehensive statutory scheme for the regulation of pesticides, another concern that motivates Maui's Ordinance. *See* HRS ch. 149A.

preemption. The statutes' delegations of broad rulemaking authority to the DOA includes the power to enact restrictions specific to GE crops, at least should the DOA find that specific GE crops are potentially harmful to agriculture or the environment. *See, e.g.*, HRS §§ 141-2, 150-22, 150A-6.1(b), (c). Indeed, the DOA has exercised its authority to impose restrictions on several commercial crops, including sugarcane, papaya, cucurbit, banana, and coffee. HAR §§ 4-72-6, 4-72-9–4-72-12. The DOA imposed these restrictions due to concerns with insects and diseases these crops carry. *Id.* However, the same authority supporting these restrictions would allow the DOA, as far as state law is concerned, to regulate GE commercial crops due to risks such as genetic contamination of non-GE crops and other plants. Indeed, as Maui's Ordinance states, "GE Organisms are not a part of the natural environment of Maui County and instead exist in the County as a possible invasive species." Ordinance § 2(3). Hawaii has numerous regulations for the control of plant pests, noxious weeds, and invasive species and has created an invasive species council to develop "policy level direction" on this subject. HRS § 194-2(a).

Hawaii's regime for regulating invasive plant species and other harmful plants, and the legislature's delegations of authority to the DOA to enact rules addressing the specific subject matter of the Ordinance distinguishes this case from those cited by SHAKA, in which the same-subject-matter requirement was not met. For example, in *Stallard v. Consolidated Maui, Inc.*, the Hawaii Supreme Court found that the same-subject-matter requirement was not met where a local law addressed timeshares at hotels while the state statutory scheme at issue regulated timeshares at developments other than hotels. 83 P.3d 731, 736–37 (Haw. 2004). Unlike *Stallard*, the state statutory scheme at issue

here addresses the "universe" of potentially harmful plants, and the County's ordinance addresses a "'galaxy' thereof," GE crops. *See Richardson*, 868 P.2d at 1209.

### 3. Hawaii's statutory scheme for the regulation of potentially harmful plants is comprehensive.

As our discussion of Hawaii's laws illustrate, the State's statutory scheme for the regulation of potentially harmful plants is comprehensive. As explained, the scheme governs the importation, sale, transportation, control, and eradication of potentially harmful plants. The scheme also addresses research and propagation of potentially harmful plants, HRS § 150A-6.1(d), and areas within the state where restricted plants may not be introduced, *id.* § 152-3. It is true that the DOA has not promulgated any rules to regulate some concerns associated with GE crops, such as genetic contamination of conventional crops and wild plant species. However, the State does have laws that would combat any such crops should they prove "detrimental or potentially harmful to agriculture, horticulture, the environment, . . . or public health." *Id.* § 150A-6.1(b). Moreover, as noted, the State coordinates closely with APHIS on the regulation of non-commercialized GE plants. We find that the State's extensive scheme for regulating potentially harmful plants can only be described as comprehensive.

### 4. The State's statutory scheme discloses a clear inference that the legislature intended for the State's regulation of potentially harmful plants to be exclusive of supplemental local rules.

Finally, we find that the statutory scheme for potentially harmful plants  discloses a clear inference that the legislature

intended for the State's regulation of potentially harmful plants to be exclusive of supplemental local regulations.

We find preemptive intent "apparent from the pervasiveness of the . . . statutory scheme." *In re Application of Anamizu*, 481 P.2d 116, 119 (Haw. 1971). The legislature's broad conferral to the DOA of power to regulate plant pests and invasive species, which per Maui's Ordinance may include GE crops, also supports an inference of preemptive intent. Similarly, in *Citizens Utilities Co. v. County of Kauai*, the Hawaii Supreme Court found a county law regulating the height of utility poles was preempted by state law that "expressly authoriz[ed a state agency] to supervise and regulate public utilities," even though the statute did not address the specific subject of pole heights. 814 P.2d 398, 400 (Haw. 1991).

Several specific provisions in the State's statutory scheme further evidence that the legislature intended for the State's regulatory oversight of potentially harmful plants to be uniform and exclusive of supplemental local rules. HRS § 141-3 states that "pest designations shall be established by rule, including the criteria and procedures for the designation of pests for control or eradication." HRS § 150A-6.1 states that the Board of Agriculture "shall maintain a list of restricted plants that require a permit for entry into the State." HRS § 194-3 states that "[a] state department that is designated as a lead agency under section [194-2(a)(7)], with respect to a particular function of invasive species control, shall have sole administrative responsibility and accountability for that designated function of invasive species control." These provisions indicate that the legislature intended to preempt counties from controlling, eradicating, or banning plants that the State has not designated as restricted

plants or invasive species. *See* HRS §§ 141-3, 150A-6.1, 194-3.

This intent to achieve uniformity in rules is made express by HRS § 194-2(a), which directs the Invasive Species Council to provide "policy level direction, coordination, and planning among state departments, federal agencies, and . . . local initiatives for the control and eradication of harmful and invasive species." *Id.* § 194-2(a). Although SHAKA references several provisions that show that local governments have a role to play in the fight against potentially harmful plants, the provisions are consistent with the position expressed in § 194-2(a) that the State is charged with setting uniform rules to guide their efforts. *See id.* § 194-2(a) (directing the invasive species council to "[i]nclude and coordinate with the counties in the fight against invasive species"); *id.* § 150-27(a)(2) (directing the DOA to "[c]ooperate with the United States Department of Agriculture and other agencies or associations in seed law enforcement"). Such provisions do not show that the legislature intended to allow local governments to unilaterally designate and ban plant pests. Rather, the State's scheme provides representatives from the county a seat at the table where such decisions are made. *See* HRS § 26-16(a) (providing for representatives from each county sit on the Hawaii Board of Agriculture).

We conclude that the legislature intended to create an exclusive, uniform, and comprehensive state statutory scheme for potentially harmful plants. By banning commercialized GE plants, the Ordinance impermissibly intrudes into this

area of exclusive State regulation and thus is beyond the County's authority under HRS § 46-1.5(13) and preempted.[16]

## III.

We hold that the district court did not err in denying SHAKA's motions to remand to state court, for Rule 56(d) discovery, and to certify the state law questions presented to the Hawaii Supreme Court. We deny the GE Parties' motion to dismiss. We hold that Maui's Ordinance banning the cultivation and testing of GE plants is preempted by the Plant Protection Act's express preemption clause in its application to GE plants regulated by APHIS as plant pests, but not expressly or impliedly preempted in its application to GE plants that APHIS has deregulated. However, we further hold that the Ordinance is impliedly preempted by Hawaii law in its application to federally deregulated, commercialized GE plants. Because we find the Ordinance invalid on other grounds, we do not address whether the Ordinance violates the Maui County Charter.

---

[16] Well after oral argument, the GE Parties submitted a letter pursuant to Fed. R. App. P. Rule 28(j) from Hawaii's Attorney General and attached a memo from a deputy attorney general analyzing state preemption of Maui's Ordinance. The memo declined to provide a "formal opinion" but concluded that "agricultural matters involving genetically modified plants and seeds are within the purview of the State, not the counties." The Attorney General's letter enclosing the memo states that it represents the Department of the Attorney General's "latest position on this matter," but does not purport to represent the DOA's position. As SHAKA points out, this position is arguably inconsistent with an earlier letter from the Department of the Attorney General, which stated that there is no statewide statute addressing cultivation of genetically modified organisms. While we have considered the Department of the Attorney General's position, we have given it little weight given the circumstances.

The district court's summary judgment in favor of the GE Parties is **AFFIRMED**.